IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

          Plaintiff

v.

JEOVANTE JONES,

          Defendant.

REPORT AND
RECOMMENDATION

09-cr-23-bbc

---

## REPORT

The grand jury has charged defendant Jeovante Jones with being a felon in possession of a firearm. Beloit police seized the firearm during a search of Jones's girlfriend's apartment undertaken pursuant to consent provided by the girlfriend, Ethlyn Joseph. Before the court is Jones's motion to suppress the firearm and other evidence seized during the search, as well as his post-arrest confession derived from the search. Jones contends that the police coerced Joseph to consent to the search. *See* Dkt. 16. The government responds that there was no coercion and argues inevitable discovery as a safety net. The government is correct on both points and I am recommending that the court deny Jones's motion.

On June 15, 2009, this court held an evidentiary hearing. Having heard and seen the witnesses, having judged their credibility and having reviewed the relevant documents, I find the following facts:

### Facts

In July 2008 defendant Jeovante Jones was the target of a drug trafficking investigation by the Beloit Police Department. Between mid-June, 2008 and July 18, 2008, a confidential informant purchased small quantities of crack cocaine from Jones three times at different

locations. The informant reported that Jones lived with his girlfriend at 1993 Colony Court, Unit 2, although the informant never had bought drugs from Jones there. In early July, 2008 Jones had provided this address as his residence following his arrest in an unrelated matter.

The police decided to conclude their investigation and arrest Jones following a fourth controlled drug buy on July 18, 2008. They contemplated preparing a conditional search warrant for the Colony Court residence but decided to wait to see what happened at the scene. The plan was for the informant to order crack from Jones but not pay for it; upon receipt of the crack, the police would swoop in and arrest Jones. That evening the informant drove to the Colony Court apartment complex and waited in his car in the parking lot. Police officers were poised nearby in a windowless panel van with running boards camouflaged to look like a handyman's work vehicle. Other officers were scattered about the perimeter of the apartment complex.

At about 9:30 p.m. Jones returned to the apartment complex with his girlfriend, Ethlyn Joseph, in her Durango. They had just run some errands prior to going out for the evening. They had Joseph's two youngest children and a young nephew (all between three and four years old) in the SUV, ensconced in booster seats. Joseph's sister was in the apartment with two older children. After Joseph drove the Durango into the parking lot, Jones stepped out and away to meet privately with the informant at his car. Jones provided crack to the informant and the officers moved in. The panel van pulled up and stopped behind both vehicles, about 15 feet from the Durango. Three officers spilled out the side door. Jones eluded them and sprinted to an adjoining cornfield.

Officer Thomas Halvorsen was left alone on the scene to deal with Joseph and her children (whom Officer Halvorsen did not see at first). Officer Halvorsen approached the Durango with his firearm drawn in the "low-ready" position, pointed toward the ground. He ordered Joseph out of the car and face-first onto the ground. Joseph, a 28 year old high school graduate with some college, had had repeated previous contacts with the criminal justice system, including several convictions. Joseph, however, was flummoxed by the sudden appearance of the police, and she did not immediately comply, instead challenging Officer Halvorsen's orders. After about five demands, Joseph unhappily complied. Officer Halvorsen cuffed Joseph's hands behind her back, helped her to her feet and brought her to the police van. Other police officers converged on the scene. A female police sergeant patted down Joseph for weapons and found nothing. Joseph was allowed to sit on the running board of the police van with her feet on the ground. The three children remained in the car; two appeared to be sleeping, one was standing in his seat. None was crying or visibly agitated.

By then Officer Andrew Arnold, the leader of this operation, had returned from the cornfield where officers had captured Jones. Hoping to enlist Joseph's cooperation, Officer Arnold removed her handcuffs and asked whether she was in need of medical attention or was okay to chat. Upon determining that Joseph was okay, Officer Arnold explained what they were doing and why they had arrested Jones. Joseph verbally distanced herself from any drug trafficking by Jones. Officer Arnold advised Joseph that the police intended to search her residence and would obtain a search warrant if necessary. Officer Arnold estimated that it would take at least two hours to obtain a warrant, although it's not clear whether he shared this estimate with Joseph. Officer Arnold did tell Joseph that if they had to get a warrant, the police

3

would not allow anyone to remain in the residence until the warrant was obtained so that they could preserve evidence from possible destruction.  If, however, Joseph consented to the search, then everyone could stay in the apartment while the search went forward.  Officer Arnold did not threaten to call Child Protective Services.  Officer Arnold did not refuse any request for the children to be taken into the apartment; in fact, he was not aware that Joseph's sister was in the apartment.

Joseph orally consented to the search.  Officer Arnold prepared a consent form and read it aloud to Joseph and asked her if she had any questions about it.  She did not.  Officer Arnold gave the form to Joseph.  She looked it over and signed it.  The form states:

> I,  **Ethlyn L. Joseph,**  HAVING BEEN INFORMED OF MY CONSTITUTIONAL RIGHTS NOT TO HAVE A SEARCH MADE OF THE PREMISES HEREINAFTER MENTIONED WITHOUT A SEARCH WARRANT AND OF MY RIGHT TO REFUSE TO CONSENT TO SUCH A SEARCH, HEREBY AUTHORIZE  **Officer Arnold** AND  **Officer Mackey** , BELOIT POLICE OFFICERS, WHO HAS IDENTIFIED THEMSELVES AS BELOIT POLICE OFFICERS, TO CONDUCT A COMPLETE SEARCH OF MY PREMISES. . . .  THIS WRITTEN PERMISSION IS BEING GIVEN BY ME TO THE ABOVE-NAMED OFFICERS VOLUNTARILY AND WITHOUT THREATS OR PROMISES OF ANY KIND.

Gov. Exh. 5.

The time elapsed from the police jumping from the van to chase Jones through Joseph's signing the consent form was 10 to 15 minutes.  Officer Arnold's conversation with Joseph had lasted five to 10 minutes.  Their conversation was calm and cordial.  Joseph never refused consent and was not cajoled into consenting to the search or signing the form.

The officers entered the residence with Joseph and her children.  Joseph, her sister and their children sat in the living room watching television while the officers searched.  The officers recovered contraband that has been charged against Jones in this case.

Later at the police station, officers confronted Jones with the evidence seized from the residence, prompting self-inculpatory statements.

ANALYSIS

Ethlyn Joseph and the Beloit police officers provided irreconcilable versions of what occurred in the parking lot last July, and the validity of Joseph's consent hinges on which version I credit. Each side takes potshots at the credibility of the opposition's witnesses; indeed, Jones accuses the police of "a clear pattern of police harassment directed at Ms. Joseph," dkt. 34 at 6, n.1. Duly noted, but not proved. While nobody got everything right, I have found that the police got it more right than Joseph did. As the facts found above reveal, I have credited the police witnesses' accounts of what occurred that night. But even if I had found Joseph more credible, I still would recommend that the court deny Jones's motion to suppress because the police could have and would have obtained a search warrant in the absence of Joseph's consent.

Jones contends that the police coerced Joseph into consenting to the apartment search. The government bears the burden of proving that Joseph consented voluntarily. Voluntariness is based on the totality of circumstances, including Joseph's age, education, and intelligence, whether she was advised of her constitutional rights; whether and how long she was detained before giving consent; whether consent was immediate or prompted by repeated requests, and whether there was any physical or psychological coercion. *United States v. Hicks*, 539 F.3d 566, 570 (7th Cir. 2008).

Jones does not dispute that Joseph was of sufficient age, education and intelligence to be capable of providing valid consent to search. Joseph was an articulate and dynamic witness at

5

the evidentiary hearing, holding her own during cross-examination. Jones does not dispute that the waiver form that Joseph signed advised her that she had the right to refuse to consent and to insist upon a warrant. Joseph, however, denies that the police read it to her, or that she read it herself, but rather just signed it because the police told her to do so after breaking her will.

They did this, claims Joseph by unnecessarily humiliating and handcuffing her in front of her crying children, hectoring her to consent despite oft-repeated refusals, and threatening to call Child Protective Services if Joseph made them apply for a warrant. Having heard from all of the witnesses, I have not credited any of this testimony. Police witnesses do not have a monopoly on the truth and they are not inherently more credible than civilian witnesses. But here, the officers' testimony was sufficiently consistent, logical and believable on the material points for me to credit it over Joseph's hyperbolic and uncorroborated testimony.

As for Officer Arnold's threat to obtain a search warrant if Joseph withheld consent "baseless threats to obtain a search warrant may render consent to search involuntary, [but] when the expressed intention to obtain a warrant is genuine and not merely a pretext to induce submission, it does not vitiate consent to search." *Hicks,* 539 F.3d at 571. Intent to obtain a warrant is genuine if the police have probable cause or a reasonable factual basis to believe there was probable cause to support a warrant. To avoid a potential cat's paw by police, the court must determine if there was a reasonable factual basis upon which to conclude there was probable cause. *Id*. at 572.

The information in the record is sufficient to establish a reasonable factual basis for the police to believe there was probable cause to support the warrant.[1] Probable cause exists when there is sufficient evidence to induce a reasonably prudent person to believe that the search will uncover evidence of a crime. When police rely on an informant's tip, relevant factors include the extent of police corroboration, the amount of first-hand observation by the informant, the amount of detail provided by the informant, the recency of the informant's information, and whether the police presented the informant to the court for a credibility determination. *United States v. Sims*, 551 F.3d 640, 644 (7th Cir. 2008). In Jones's case, the CI already had three recent controlled crack buys into Jones and had obtained more crack from him on July 18 in the parking lot of the Colony Court complex. A controlled buy, when executed properly, is a reliable indicator as to the presence of illegal drug activity. *United States v. Sidwell*, 440 F.3d 865, 869 (7th Cir. 2006). Here, there were four within a month. In the case of drug dealers, evidence is likely to be found where the dealers live. *United States v. Hoffman*, 519 F.3d 672, 676 (7th Cir. 2008). Jones himself recently had reported 1993 Colony Court, Apt. 2 as his residence, and the circumstances preceding his arrest–returning to the apartment mid-evening with his girlfriend–corroborated this report. Also, the police could have used information learned from Joseph to bolster their evidence that Jones lived with her, because this is information Officer Arnold would

---

[1] Indeed, Officer Arnold testified that the police had mulled obtaining an anticipatory search warrant, but decided to wait and see what happened at the scene. Jones challenges this claim, but it's a logical and efficient approach. Preparing a search warrant affidavit and jumping through the hoops to obtain a warrant is time-consuming and toilsome. That's why police often gamble on obtaining consent at the scene before starting the warrant process. (It's also why police to push hard for consent, something that courts must scrutinize closely.) A corollary is that people who are asked to consent often agree because the alternative is to be locked out of their residence for a couple of hours before the search even begins. But choosing between two unpalatable choices does not render the decision involuntary. *See United States v. Miller*, 450 F.3d 270, 272-73 (7th Cir. 2006).

have known at the time he applied for a warrant in the event that Joseph did not consent to the search.

This segues to the government's invocation of the inevitable discovery doctrine, which imposes a higher burden of persuasion: the government must prove that "a warrant would certainly, and not merely probably, have been issued had it been applied for." *United States v. Tejada*, 524 F.3d 809, 813 (7th Cir. 2008). Although Jones argues otherwise,, the evidence listed above sufficiently established probable cause to search 1993 Colony Court, Unit 2 so that a search warrant would certainly have issued if requested. This constitutes a second ground to deny Jones's motion to suppress.

Finally, Jones's motion to suppress his post-arrest statements is tied to his claim that these statements were derived from an illegal search. *See United States v. Budd*, 549 F.3d 1140, 1144 (7th Cir. 2008). Because the search was legal, Jones's statements should not be suppressed.

## RECOMMENDATION

Pursuant to 42 U.S.C. § 636(b)(1)(B) and for the reasons stated above, I recommend that this court deny in all respects defendant Jeovante Jones's motion to suppress evidence.

Entered this 10th day of July, 2009.

> BY THE COURT:
>
> /s/
>
> STEPHEN L. CROCKER
> Magistrate Judge

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN
120 N. Henry Street, Rm. 540
Post Office Box 591
Madison, Wisconsin 53701

Chambers of
STEPHEN L. CROCKER
U.S. Magistrate Judge

Telephone
(608) 264-5153

July 10, 2009

Robert Anderson
Assistant U.S. Attorney
P.O. Box 1585
Madison, WI 53701-1585

Kelly Welsh
Federal Defender Services of Wisconsin, Inc.
222 West Washington Avenue, Ste. 300
Madison, WI 53703

      Re:   United States v. Jeovante Jones
            Case No. 09-cr-23-bbc

Dear Counsel:

      The attached Report and Recommendation has been filed with the court by the United States Magistrate Judge.

      The court will delay consideration of the Report in order to give the parties an opportunity to comment on the magistrate judge's recommendations.

      In accordance with the provisions set forth in the memorandum of the Clerk of Court for this district which is also enclosed, objections to any portion of the report may be raised by either party on or before July 24, 2009, by filing a memorandum with the court with a copy to opposing counsel.

      If no memorandum is received by July 24, 2009, the court will proceed to consider the magistrate judge's Report and Recommendation.

      Sincerely,

      /s/

      Connie A. Korth
      Secretary to Magistrate Judge Crocker

Enclosures
cc:    Honorable Barbara B. Crabb, District Judge

MEMORANDUM REGARDING REPORTS AND RECOMMENDATIONS

Pursuant to 28 U.S.C. § 636(b), the district judges of this court have designated the full-time magistrate judge to submit to them proposed findings of fact and recommendations for disposition by the district judges of motions seeking:

(1) injunctive relief;

(2) judgment on the pleadings;

(3) summary judgment;

(4) to dismiss or quash an indictment or information;

(5) to suppress evidence in a criminal case;

(6) to dismiss or to permit maintenance of a class action;

(7) to dismiss for failure to state a claim upon which relief can be granted;

(8) to dismiss actions involuntarily; and

(9) applications for post-trial relief made by individuals convicted of criminal offenses.

Pursuant to § 636(b)(1)(B) and (C), the magistrate judge will conduct any necessary hearings and will file and serve a report and recommendation setting forth his proposed findings of fact and recommended disposition of each motion.

Any party may object to the magistrate judge's findings of fact and recommended disposition by filing and serving written objections not later than the date specified by the court in the report and recommendation. Any written objection must identify specifically all proposed findings of fact and all proposed conclusions of law to which the party objects and must set forth with particularity the bases for these objections. An objecting party shall serve and file a copy of the transcript of those

portions of any evidentiary hearing relevant to the proposed findings or conclusions to which that party is objection. Upon a party's showing of good cause, the district judge or magistrate judge may extend the deadline for filing and serving objections.

After the time to object has passed, the clerk of court shall transmit to the district judge the magistrate judge's report and recommendation along with any objections to it.

The district judge shall review de novo those portions of the report and recommendation to which a party objects. The district judge, in his or her discretion, may review portions of the report and recommendation to which there is no objection. The district judge may accept, reject or modify, in whole or in part, the magistrate judge's proposed findings and conclusions. The district judge, in his or her discretion, may conduct a hearing, receive additional evidence, recall witnesses, recommit the matter to the magistrate judge, or make a determination based on the record developed before the magistrate judge.

**NOTE WELL: A party's failure to file timely, specific objections to the magistrate's proposed findings of fact and conclusions of law constitutes waiver of that party's right to appeal to the United States Court of Appeals.** *See United States v. Hall,* 462 F.3d 684, 688 (7th Cir. 2006).